IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JASON H. FURMAN AND ERIN FURMAN,<br>INDIVIDUALLY AND AS<br>NEXT FRIEND OF AJF,<br>WEF AND OCF, MINORS,<br><br>    PLAINTIFFS<br><br>v.<br><br>AETC II PRIVATIZED HOUSING, LLC;<br>AETC II PROPERTY MANAGERS, LLC; AND<br>HUNT ELP, LTD. D/B/A HUNT MILITARY<br>COMMUNITIES,<br><br>    DEFENDANTS | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. _5:20-cv-01138__ |

## PLAINTIFFS' ORIGINAL COMPLAINT

NOW COME Plaintiffs Jason H. Furman and Erin G. Furman, individually and as next friend of AJF, WEF and OCF, minors ("Plaintiffs"), and file this *Original Complaint* ("Complaint"), complaining of Defendants AETC II Privatized Housing, LLC, AETC II Property Managers, LLC, and Hunt ELP, Ltd. d/b/a Hunt Military Communities ("Defendants"), and in support hereof, respectfully show the Court as follows:

### I. PRELIMINARY STATEMENT

1.      In 1996, the U.S. Congress passed the Military Housing Privatization Initiative, allowing the U.S. Department of Defense to privatize housing on military bases. By 2007, the U.S. Air Force executed a 50-year lease and a Quitclaim Deed in favor of AETC II Privatized Housing, LLC for the real estate and improvements comprising the service-member housing section of Goodfellow Airforce Base ("GAFB") in Tom Green County, Texas. AETC II Privatized

Housing, LLC is part of the Hunt family of companies operating under the assumed name of Hunt Military Communities. From 2007 to the present, AETC II Privatized Housing, LLC, as landlord, acting through its authorized agent, AETC II Property Managers, LLC, and in conjunction with the property management company, Hunt ELP, Ltd. d/b/a Hunt Military Communities (collectively, "Hunt"), have leased and managed houses to service-members and their families stationed at GAFB, happily taking all of the service-member's base housing allowance ("BAH").

2.     Throughout that time period, Hunt has systematically undermaintained the houses located on GAFB, subjecting service-members and their families to atrocious conditions, including pervasive mold. When Hunt received service requests from service-members and their families, Hunt would misdiagnose the issue, utilize substandard service providers to allegedly remediate the problems, and would mislead its tenants about the remediation actions allegedly undertaken. As a result, many service-members and their families have become ill as a result of mold exposure, have lost nearly all their personal possessions, and have paid their full base housing allowance for substandard houses. By this lawsuit, Plaintiffs seek to hold Hunt, a foreign, for-profit corporation organized under the laws of Delaware, liable for the conditions to which Hunt subjected Plaintiffs.

## II. PARTIES

3.     Plaintiffs are a military family that lived in privatized housing located on GAFB in San Angelo, Texas.

4.     Defendant AETC II Privatized Housing, LLC, is a foreign limited liability company that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

5.      Defendant AETC II Property Managers, LLC, is a foreign limited liability company that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

6.      Defendant Hunt ELP, Ltd., d/b/a Hunt Military Communities[1] is a domestic limited partnership that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

7.      The Defendant parties are currently defendants in a related case, pending under Case No 5:19-cv-01280-FB.

### III. JURISDICTION

8.      This Court has jurisdiction over this proceeding pursuant to federal enclave subject-matter jurisdiction. Federal enclave jurisdiction is part of the court's federal question jurisdiction under 28 U.S.C. § 1331. *See Paul v. United States*, 371 U.S. 245, 267 (1963); *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Arlington Hotel Co. v. Fant*, 278 U.S. 439, 455 (1929); *Sparling v. Doyle*, No. EP-12-cv-323-DCG, 2014 WL 2448926, at *3, (W.D. Tex. May 30, 2014).

9.      A federal enclave is land over which the United States government exercises federal legislative jurisdiction. *Kelly v. Lockheed Martin S'vcs. Group*, 25 F.Supp.2d 1, 3 (D. Puerto Rico 1998). Authority for federal enclave jurisdiction arises pursuant to Article I, section 8, Clause 17 of the United States Constitution, which provides in relevant part:

> The Congress shall have the power ... to exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over

---

[1] Hunt Military Communities is an umbrella termed used by Hunt to denote Hunt business entities that relate to military housing communities.  Property managers for GAFB use "Hunt Military Communities" as the title of their employer and all housing-related materials direct you to Hunt Military Communities and its website.

> all Places purchased by the consent of the Legislature of the State in
> which the Same shall be, for the Erection of Forts, Magazines,
> Arsenals, dock-Yards, and other needful Buildings.

10.     Because the federal government has exclusive legislative powers over federal enclaves, courts have recognized that United States courts also have subject-matter jurisdiction over controversies arising on federal enclaves. *See Matter v. Holley*, 200 F.2d 123, 124–125 (5th Cir. 1952) ("It would be incongruous to hold that although the United States has exclusive sovereignty in the area here involved, its courts are without power to adjudicate cases arising there."); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'").

11.     The events giving rise to Plaintiffs' lawsuit occurred on GAFB, which indisputably qualifies as a federal enclave.  In determining whether a claim arises on a federal enclave, courts have simply looked to see where the "pertinent events" took place. *Stiefel v. Bechtel Corp.*, 497 F.Supp.2d 1138, 1148 (S.D. Cal. 2007) (citing *Snow v. Bechtel Const. Inc.*, 647 F.Supp. 1514, 1521 (C.D. Ca1.1986)). It is facially apparent from the Plaintiffs' Complaint that the pertinent events alleged by Plaintiffs giving rise to the claims arise out of Plaintiffs' occupancy in Hunt controlled properties on GAFB.

## IV. VENUE

12.     Venue in this proceeding is proper before this Court pursuant to 28 U.S.C. § 1391, as the Defendants do busines within the Western District of Texas and related-litigation is pending in the Western District of Texas.

## V. FACTS

13.     Goodfellow Air Force Base is owned by the U. S. Air Force and is under the exclusive jurisdiction of the United States and by definition is a federal enclave. Since its inception,

GAFB has served as home for thousands of service members and their families. In 1996, the United States Congress established the MHPI with the chief aim of attracting private-sector financing, expertise, and innovation to provide necessary housing faster and more efficiently than traditional military construction process would allow. National Defense Authorization Act for Fiscal Year 1996, § 2601(a)(1), 10 U.S.C. § 2872.  Under the MHPI, secretaries of defense may invest in eligible nongovernmental entities conducting projects "for the acquisition or construction of housing units suitable for use as military family housing or as military unaccompanied housing." *Id.*, 10 U.S.C. § 2875.

14.     Pursuant to the MHPI the United States Air Force selected Defendants to engage in a public/private venture with the government to own and manage family housing. Specifically, Defendants would be responsible for maintaining, repairing, constructing and managing the housing community at GAFB.  AETC II Privatized Housing, LLC, was formed as a joint venture with the United States Air Force, and the United States conveyed to Defendants, pursuant to a Lease and Quitclaim Deed, the housing units and underlying land at GAFB.  As a result, Defendants became the landlords and property managers for all housing at GAFB.

15.     Pursuant to the MHPI, the military was encouraged "to stimulate private sector financing of military housing construction and revitalization projects." S. Rep. No. 104-112 (1995).

16.     The MHPI provides the Department of Defense ("DOD") with twelve alternative authorities or tools to initiate housing projects which include the authorization of direct loans and loan guarantees, differential payments to supplement service members' housing allowances, investments such as limited partnerships, stock/bond ownership, and limited liability companies, and the conveyance or lease of military housing units to the contractor.

17.     There are about 80 privatized projects encompassing more than 204,000 housing units located on more than 150 installations. The DOD considers these houses to be private housing. Service members who lease housing on a military installation are required to pay the privatized housing company the full amount of their BAH regardless of the size or condition of the house.

18.     Before MHPI, the home was provided in lieu of the BAH. This change created continuous revenue flow for the life of the management contract and, conceptually, requires little additional funding from the government.

19.     The privatized housing companies directly receive BAH payments from the Department of Defense, leaving service members, including Plaintiffs, with no control over their BAH and no leverage against the privatized housing companies when problems exist with their homes.   The privatized housing companies also have a direct line of communication with the military, and are keenly aware that a single call to the service members' chain of command will likely stifle any complaints a service member may have about their housing.. Consequently, Defendants often prey on Plaintiffs' fears of reprisal even when conditions within the rental homes merit no BAH payment whatsoever.

20.     Privatizing U.S. military housing was supposed to *protect* service members' families. The military knew hazards lurked in its housing, and private companies likewise knew that when they took over. In 2005, the U.S. Army released an environmental study that said that 75% of its 90,000 homes nationwide did not meet its own standards of quality or safety. Twenty years after privatization, in 2016, a DOD Inspector General Report found that poor maintenance and oversight left service families vulnerable to "pervasive" health and safety hazards.

21.     Beginning in 2018, Reuters published a series of news articles detailing substandard living conditions at U.S. military bases, including lead exposure, vermin infestation, mold and other contaminants. The reports described how military families encounter high hurdles to resolving disputes in a system that grants vast power to private landlords who manage base housing across the United States.

22.     In November 2018, the investigative arm of Congress launched an inquiry into hazards faced by occupants of housing on U.S. military bases and the oversight of those conditions by the armed services.

23.     On December 3, 2018, a hearing was held before the United States Senate's Committee on Armed Services. At the onset of the hearing, Senator James M. Inhofe from Oklahoma stated as follows:

> Almost a year ago, I first heard from military families about the dismal conditions they faced.  Frankly, if confession is good for the soul, Janet Driver called this to my attention from Tinker Air Force Base.  And I thought this was something that was just unique to Tinker Air Force Base, and then I thought no.  It is elsewhere in Oklahoma.  But then it is also all the way around the country.  And so that was the background of how this all started.

> We have come to learn that it is a problem nationwide.  It is a national crisis of proportions we have not seen since the scandal at Walter Reed about a decade ago.

Senator Inhofe further added:

> We continue to hear regularly from the families across the country about questionable practices, poor workmanship, and frankly, in some places about housing contractors just not caring about the families they are supposed to be serving.

> Additionally, as reported in the press, some of these contractors are now under investigation for defrauding the Federal Government.  I am really worried.  What else can come out of the woodwork on this?  What else don't we know?

. . . .

> Regardless of any potential criminal wrongdoing, we are still receiving complaints on a daily basis showing that you are still failing to fix this problem.

24.     During the same Senate hearing, Elizabeth A. Field, Director, Defense and Management, Government Accountability Office, testified:

> We analyzed over 8 million work order records from all 14 private partners and all 79 projects . . . . we found anomalies in the data provided by all 14 private partners such as duplicate work orders and work orders with completion dates prior to when they were submitted.

Field then added:

> The problems I detail are significant . . . . because the Department has been using these metrics to reward and incentivize the private partners.

25.     Private military housing companies, including Defendants in this case, upon information and belief, manipulated service and repair records to the detriment of residents to drive up profits, including "inventive fees," that could be collected as part of its contract with the government.

26.     Senator Elizabeth Warren opened her own investigation of the MHPI and five military housing landlord companies, including Defendants in this case on February 6, 2019.

27.     In Senate testimony on February 13, 2019, John Ehle, President of Hunt Military Communities testified that, with respect to inconsistent treatment of military residents, "[t]he lack of consistency is something we're extremely focused on all across our portfolio, and it's one of the reasons why we are focused on promoting standardization across not just our portfolio but the industry."  Mr. Ehle further testified that "in terms of our environmental concerns, environmental concerns are on the rise in the last couple years, we've seen mold to an extent we haven't see in a

long, long time.  Caused by some extreme climatic conditions that have not historically been seen but I don't think that's going to change in the future.  So we're beefing up our environmental expertise on site and at the corporate level…".

28.     Senator Warren submitted her written report, dated April 30, 2019, which contained four conclusions: (1) the private military housing providers have set up a complicated web of subcontractors and subsidiaries that undermines accountability for substandard conditions in military housing and makes it difficult to track revenues, profits, and the flow of funds; (2) the private military housing providers have failed to create accessible or centralized records and protocols to address complaints and reports of problems with military housing, which makes comprehensive assessment and oversight of their performance difficult and complicates efforts to improve housing quality; (3) private housing providers are making large profits while taking minimal investment risks; and (4) the companies and their subsidiaries are receiving sizeable incentive fees even when they face substantial quality control challenges.

29.     Since having ownership of the subject housing units at GAFB transferred to them and being delegated maintenance responsibility for the same, the Landlord Companies have systematically undermaintained the units, subjecting tenant families to the above-described atrocious conditions.

30.     In their dealings with the Servicemembers, but for the admissions and acknowledgements in their congressional testimony, the Landlord Companies refuse to acknowledge the severity of the problems and refuse to adequately remedy them, instead moving them again and again and again to new houses they assure service members are just fine.

31.     As a result, many service members and their families have fallen ill due to exposure to the mold and other toxins, lost nearly all their personal possessions (some as a result of living

in multiple houses with environmental issues), and paid their full BAH in exchange for woefully substandard facilities.

## Capt. Jason H. FURMAN AND Erin G. FURMAN

32.     Marine Captain Jason H. Furman and his wife, Erin G. Furman and their two children, then 4 years and 22 months, moved to Goodfellow Air Force Base in the summer of 2018,and  shortly moved into base housing at GAFB where they began to encounter problems with their base housing unit.  Their youngest child was born in San Angelo while they were living in base housing.

33.     Capt. and Mrs. Furman gave up their basic housing allowance, 100% paid to the Defendants, in exchange for the house.  Despite the fact that the U. S. Air Force had built the house and owned the base, the Defendants' deal under the MHPI allowed them to collect the BAH.  All the Defendants were required to do was maintain the housing in a safe habitable condition.  Within a short time, the Furmans were driven from their house by toxic mold, which occurred as a result of Defendants' failure to maintain the house.

34.     The first signs of problems in the Furman home on GAFB happened when the paint over the drywall started bubbling up in the dining room following heavy rains. Defendants waited more than a month to do anything about the problem, other than send two maintenance workers out to the home who said they were not authorized to get on the roof.  The roof was believed to be the source of the leak. Conditions in the home got so bad after "marinating" in water for weeks that the sheetrock appeared to be melting off the walls. This happened despite emails with pleas from the Furmans that showed pictures documenting the deteriorating conditions in the house. At the time, the Furmans had a 4-year-old son, a 1-year-old daughter and Erin Furman was pregnant with their third child. After Hunt workers finally came to investigate, the Furmans saw the extent

of the water damage behind the walls. Concerned about mold, Captain Furman insisted the family

be moved. The only alternative housing that Hunt made available was a one-bedroom hotel on the

base.  Because of the cramped conditions this only turned out to be a temporary solution.  The

family was left to their own devices and were forced to seek rental housing in the community of

San Angelo at a rate above what Captain Furman's housing allowance would cover.

35.     The Furmans also incurred the expense of yet another move due to the intolerable

conditions caused by the housing company.  Health hazards were of a major concern to the young

family. Captain Furman became severely ill after he went back in the home for about an hour to

check on his pets. Despite later assurances from Hunt representatives that conditions in the home

had been remediated, the Furmans had independent documentation showing harmful mold levels

were still present. The failures of the housing company lead to toxic mold. It was costly in both

time and money for the family. However, the biggest concern of the Furmans was the health

ramifications of mold exposure to their three young children.  In addition, the Furman family was

forced to abandon most of their household goods and other possessions.  Though they tried to

remediate what they could, items such as fabric furniture, mattresses, clothing, books and family

papers all had to be destroyed because of mold infestation.  This created additional financial

hardship on them to replace necessary items.

## VI.   CONDITIONS PRECEDENT

36.     All conditions precedent to Plaintiffs' recovery have occurred or have been waived,

excused, or otherwise satisfied. All notices required have been provided or were waived, excused,

or otherwise satisfied

## VIII.   CAUSES OF ACTION

37.     Paragraphs 1 through 36 are incorporated into this section and all causes of action asserted herein by reference as if fully set forth again.

## Count 1 – BREACH OF IMPLIED WARRANTY OF HABITABILITY AND WARRANTY OF GOOD AND WORKMANLIKE REPAIRS

38.     Pleading further, Plaintiffs assert claims against Defendants for violations of the Texas Property Code, including section 92.051, *et. seq.,* and for breaching the implied warranty of habitability and the implied warranty of good and workmanlike repairs.

39.     Plaintiffs have, in accordance with their leases and chapter 92 of the Texas Property Code, given Defendants notice of a myriad of issues identified in Section V herein associated with the house the family leased at GAFB.  Nevertheless, Defendants failed to repair defects and make the house habitable for human occupation.  Defendants had adequate time to repair or remedy the unsafe and unsanitary conditions after Plaintiffs' notice, but did not made a diligent effort to repair or remedy the condition after receiving notice from Plaintiffs or , have made efforts to repair and remedy conditions but have done so in a manner that does not conform to a good and workmanlike standard.

40.     Moreover, unique to the fact that Defendants are in the business of leasing to members of the military and obtaining rent payments directly from the U.S. government and providing housing on a base affiliated with good schools, Defendants have effectively deprived Plaintiffs of potential remedies, including withholding rent and performing repairs themselves, or terminating their respective leases and moving to suitable housing.

41.     Defendants' conduct, therefore, violates section 92.051 *et seq.* of the Texas Property Code and has further deprived Plaintiffs of remedies that are statutorily prescribed. Defendants' conduct further violated the implied warranty of habitability and the warranty that all

repairs were done in a good and workmanlike manner. As a result, Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, statutory damages, and attorneys' fees and costs as authorized by sections 92.056 and 92.0563 of the Texas Property Code.

## Count 2 – BREACH OF CONTRACT

42.     Pleading further, Plaintiffs assert claims against Defendants for breach of the Military Housing Residential Lease ("Lease") to which the Plaintiffs'-family and Defendants are parties.

43.     Pursuant to Texas law, implicit in the Lease is the warranty that Defendants were leasing Plaintiffs a house that was fit for human habitation.  Further, pursuant to Plaintiffs' lease, Defendants were required to make a diligent effort to repair or remedy the condition at the premises.  Additionally, where Defendants did perform repairs or direct their agents to perform repairs, Defendants were bound by the implied warranty to perform repairs in a good and workmanlike manner.

44.     Defendants failed to comply with the material terms of Plaintiffs' lease, by failing to ensure that the house Defendants leased to Plaintiffs was fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation at the premises as set forth in more detail in Section V herein.  On the rare occasion that Defendants did perform repairs or direct their agents to perform repairs, the repairs were done poorly and did not remediate the damage. As such, Defendants have materially breached their lease with Plaintiffs, causing Plaintiffs actual damages.

45.     Because of Defendants' breaches, Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages for

medical treatments to be incurred in the future, and attorneys' fees and costs pursuant to section 38.001 of the Texas Civil Practice and Remedies Code.

**Count 3 – Negligence and Negligent Misrepresentation**

46.     Pleading further, Plaintiffs assert claims against Defendants for negligence and negligent misrepresentation in connection with the lease and maintenance of the house to Plaintiffs.

47.     Defendants, as specialized landlords in the business of privatized military housing, owed Plaintiffs a duty to provide them with habitable living conditions in the house leased to them, and to properly maintain and repair the house to a standard fit for human habitation.  Defendants' conduct fell far below the applicable standard of care due to Plaintiffs.  Defendants' breaches of their duty consist of failing to properly evaluate housing conditions to ensure leased properties were fit for human habitation and failing to properly repair and remedy those conditions affecting human health and safety.

48.     Moreover, Defendants, with specialized knowledge regarding the business of military tenancies and the properties leased to the Plaintiffs, and pecuniary interest in leasing houses to military families, falsely represented to Plaintiffs that their house was safe and fit for human habitation and were and would continue to be properly maintained, without exercising reasonable diligence in ascertaining whether the house was habitable.  Plaintiffs, who were not given an opportunity to inspect the house leased to them prior to signing the lease, justifiably relied on the misrepresentations of Defendants (a privatized housing company associated with the military).

49.     As a proximate cause of Defendants' conduct, Plaintiffs have incurred and seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past,

economic damages for medical treatments to be incurred in the future, and exemplary damages for Defendants' gross negligence pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

**Count 4 – STATUTORY FRAUD IN A REAL ESTATE TRANSACTION**

50.     Pleading further, Plaintiffs assert claims against Defendants for statutory fraud.

51.     Pursuant to section 27.01 of the Texas Business and Commerce Code, fraud in a transaction involving real estate consists of a false representation of past or existing material fact when the representation is made to a person to induce them to enter into a contract and relied on by that person in entering into that contract.  Furthermore, fraud in a transaction involve real estate consists of a false promise to do an act when it is material, made with the intention of not fulfilling it, made to induce a person to enter into a contract, and relied upon by the person in entering into that contract.

52.     Undisputedly, Plaintiffs and Defendants entered into a lease, which is a transaction involving real estate.  In the course of that transaction, Defendants represented to Plaintiffs that the house being leased to them was safe for human habitation and that Defendants would perform repair and remedy work to keep the house habitable throughout the term of the lease.  Defendants made these representations to Plaintiffs to induce them to sign a lease (including discussing repairs and remedies in of the lease), and Plaintiffs justifiably relied on those representations and promises because of the nature of the association between the military and Defendants, which exclusively controlled and leased on base housing at GAFB.

53.     However, because the house managed and leased by Defendants to the Plaintiffs suffered from pervasive mold and condition issues and have been 'repaired' to no avail for years, it is readily apparent that Defendants were aware that their representations that the house was fit

for human habitation were false, and their promise to perform future repairs to make the house habitable was made without any intention of fulfilling it.

54.     As a result, Plaintiffs suffered damages.  Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, and attorneys' fees and costs pursuant to Chapter 27 of the Texas Business and Commerce Code.  Plaintiffs further seek to recover exemplary damages in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code because Plaintiffs' damages arose from Defendants' fraud and/or malice.

**Count 5 – COMMON LAW FRAUD**

55.     Pleading further, Plaintiffs assert claims against Defendants for common law fraud.

56.     As described herein, Defendants made multiple material omissions regarding the condition of the house, and multiple misrepresentations regarding the habitability of the house. Defendants also made representations that repair work would be completed or had been completed, and that as a result, the house had become habitable and the problems resolved.  Defendants were aware that all of their omissions of fact concerning the condition of the house was material when they presented Plaintiffs with a lease, and Defendants – because of the ongoing condition issues, repair and remedy of the same problem, and pervasive mold reporting – knew that their representations regarding the habitability of the houses were false and/or misleading. Despite knowing the falsity, Defendants made these representations intentionally or, at the very least, recklessly, as positive assertions and without knowledge of their truth.

57.     Defendants intentionally omitted information and made the foregoing misrepresentations with the intent that Plaintiffs would rely on them and enter into a lease, and, in fact, Plaintiffs did rely thereon to their detriment.  Plaintiffs' reliance was justified given their lack of

an ability to inspect the house and given Defendants' power over the market.  This conduct caused injury to Plaintiffs, including but not limited to paying rent for an uninhabitable house, excessive utility bills, environmental testing, and medical expenses in the past and to be incurred in the future.

58.    As a result of Defendants' conduct, Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, mental anguish damages, and exemplary damages in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code as Plaintiffs' damages arose from Defendants' fraud and/or malice.

## Count 6 – UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED

59.    Through the transactions described herein, Defendants were in the business of and  were on notice that Plaintiffs intended to lease from them habitable housing on military bases in  Texas.  Defendants, through their conduct in leasing Plaintiffs substandard housing that  Defendants failed to maintain in exchange for Plaintiffs' BAH, have been unjustly enriched and  have received money from Plaintiffs that, in equity and good conscience, belongs to Plaintiffs.

## Count 7 – INTENTIONAL NUISANCE

60.    Pleading further, Plaintiffs assert claims against Defendants for intentional nuisance.

61.    As described herein, Defendants refused to act to maintain houses on GAFB with the knowledge that their inaction would result in dangerous living conditions, or that  their inaction was substantially certain to result in dangerous living conditions, thereby interfering  with the tenant's use and enjoyment of their leased house.

62.     Defendants' interference with Plaintiffs' enjoyment of their house was substantial, causing physical damage to the Plaintiffs' personal property, harm to Plaintiffs' health, and psychological harm to the Plaintiffs' "peace of mind" in the use and enjoyment of their house.

63.     The effect of Defendants' substantial interference in Plaintiffs' enjoyment of their property was unreasonable. Defendants created conditions that resulted in offensive and intolerable living environments that endangered Plaintiffs' health and property.

64.     As a result of Defendants' conduct, Plaintiffs seek to recover from Defendants, jointly and severally, all actual damages, exemplary damages, and costs and fees.

65.     Plaintiffs further seek injunctive relief to prevent Defendants from continuing to create conditions constituting a nuisance pursuant to Fed. R. Civ. P. 65. As described herein, Defendants have engaged in conduct substantially interfering with Plaintiffs' enjoyment of their property, resulting in physical injury, psychological harm, and damage to Plaintiffs' house and belongings. Unless enjoined, Defendants are likely to continue to ignore their tenants' complaints and permit dangerous conditions to remain unrepaired. Defendants' conduct has caused irreparable injury to Plaintiffs and will continue to do so unless Defendants are enjoined. Plaintiffs have no adequate remedy at law to prevent their ongoing injury. Accordingly, Plaintiffs seek entry of preliminary and permanent injunctive relief.

**Count 8 – NEGLIGENT NUISANCE**

66.     Pleading further, Plaintiffs assert claims against Defendants for negligent nuisance.

67.     As described herein, Defendants negligently failed to act when they owed Plaintiffs a duty as landlord and remediator to act, resulting in an unreasonable interference with Plaintiffs' enjoyment of their house.

18

68.     Defendants failed to take precautions against the risk that dangerous living conditions would result from their inaction or substandard action when Defendants had the ability to control the repairs on the house and abate such dangers.

69.     As a result of Defendants' conduct, Plaintiffs seek to recover from Defendants, jointly and severally, all actual damages, exemplary damages, and costs and fees.

70.     Plaintiffs further seek injunctive relief to prevent Defendants from continuing to create conditions constituting a nuisance. As described herein, Defendants have engaged in  conduct substantially interfering with Plaintiffs' enjoyment of their house, resulting in physical  injury, psychological harm, and damage to Plaintiffs' house and belongings. Unless enjoined, Defendants are likely to continue to ignore their tenants' complaints and permit dangerous  conditions to remain unrepaired. Defendants' conduct has caused irreparable injury to Plaintiffs and will continue to do so unless Defendants are enjoined. Plaintiffs have no adequate remedy at  law to prevent their ongoing injury. Accordingly, Plaintiffs seek entry of preliminary and  permanent injunctive relief.

**Count 9 – GROSS NEGLIGENCE**

71.     Pleading further, Plaintiffs assert claims against Defendants for gross negligence.

72.     As described herein, Defendants leased to Plaintiffs a home with pervasive mold,  plumbing issues, and water intrusion issues, without notifying Plaintiffs  of the potentially hazardous conditions. Defendants were aware that the house on GAFB had persistent, toxic problems, as prior tenants had made them aware of the hazards on  numerous occasions.

73.     After Plaintiffs moved into their home and discovered the issues, they complained to Defendants. Defendants refused to act to properly remediate or abate the toxic mold and the  standing water sewage brought to their attention, despite knowledge that  their failure to act

would only exacerbate the problems. When Defendants did act, they repaired or permitted repairs to be made that did not eradicate the problem, resulting in continuing harm.

74. Defendants acted and failed to act in conscious indifference to the rights, safety, or welfare of Plaintiffs when they knew that such acts and failures to act would clearly and unquestionably result in dangerous health conditions and serious injury for their tenants and destruction of their tenants' property. Defendants' concealment of toxic conditions, and then refusal and failure to remediate the toxic conditions in a timely and adequate manner, constitute gross negligence.

75. As a result of Defendants' conduct, Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, and exemplary damages in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code as Plaintiffs' damages arose from Defendants' gross negligence.

## IX.   ATTORNEYS' FEES & COSTS

76. Pursuant to section 38.001 of the Texas Civil Practice and Remedies Code, section 27.01 of the Texas Business and Commerce Code, chapter 92 of the Texas Property Code, and section 17.50(d) of the Texas Business and Commerce Code, and as otherwise allowed by law, Plaintiffs are entitled to recover from Defendants all of their reasonable attorneys' fees and expenses incurred in connection with this lawsuit. Plaintiffs are also entitled to recover from Defendants all costs of court.

## X.   EXEMPLARY DAMAGES

77. Pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code, because the injury suffered by Plaintiffs resulted from the fraud, malice, and/or gross negligence of

Defendants, Plaintiff are entitled to and seek the recovery of exemplary damages from Defendants.

## XI.   JOINT LIABILITY

78.     Defendants are jointly and severally liable to Plaintiffs on all causes of action asserted herein for a multitude of reasons.

79.     First, Defendants had a meeting of the minds and embarked on a systematic attempt to defraud Plaintiffs by making false representations and promises to Plaintiffs in order to induce them to lease with Defendants, without any legitimate expectation that they would provide Plaintiffs with a habitable home as promised.  Defendants engaged in one or more unlawful, overt acts to accomplish the actions complained of herein.  Therefore, all Defendants are jointly and severally liable for the claims asserted against each of them.

80.     Second, Defendants are part of a joint enterprise or single business enterprise associated with the rental of houses at GAFB and are not individually distinguishable.   All Defendants carried on business as a mutual undertaking with a common business or pecuniary purpose and using the common name "Hunt Military Communities."   Defendants had an express or implied agreement for a common purpose to be carried out by their enterprise, had a community of pecuniary interest, and each had an equal right to direct and control the enterprise.  Therefore, all Defendants were engaged in a single, joint enterprise and each of them is jointly and severally liable for the claims asserted against each of them.

81.     Third, Defendants intentionally conferred authority on one another to act on their behalf, intentionally allowed one another to believe they had authority to act on behalf on one another, and/or by lack of care, allowed one another to believe they had authority to act on behalf of one another.  As a result, all Defendants acted as the agent of the others in the course of the

conduct described herein.  Therefore, all Defendants are jointly and severally liable for the claims asserted against each of them.

82.     Fourth, Defendants committed the acts complained of herein on behalf on one another and ratified the same.  Each of the Defendants approved these acts by word, act, or conduct after acquiring full knowledge of these acts, including accepting money from Plaintiffs.  This approval was given with the intention of giving validity to the acts.  Therefore, all Defendants are jointly and severally liable for the claims asserted against each of them.

83.     Fifth, a person who knowingly aids and abets and/or participates in a breach of duty or fraudulent conduct is liable as a joint tortfeasor.  All Defendants aided and abetted, participated in, and induced each other to make fraudulent representations and promises to Plaintiffs and to breach their duties set forth herein.  Each of the Defendants did so knowingly and benefitted from such conduct.  Therefore, each is jointly and severally liable for the same.

## XII.    JURY DEMAND

84.     Plaintiffs demand a trial by jury and tender the jury fee in connection with the filing of their Original Complaint.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Court grant them judgment against Defendants, jointly and severally, on all claims and for all relief sought herein, including but not limited to, judgment for:

  a. Actual damages in the past and future;
  b. Mental anguish damages;
  c. Statutory damages;
  d. Treble damages;
  e. Exemplary damages;
  f. Reasonable and necessary attorneys' fees and costs of court;

g.   Pre-judgment interest at the highest rate allowed by law;

h.   Post-judgment interest at the highest rate allowed by law from the date of judgment until paid;

i.   All writs necessary to effectuate the judgment; and

j.   Such other and further relief, at law or in equity, as the Court deems to be just, proper, and equitable.

Respectfully submitted,

**FURMAN LAW GROUP**
3736 Bee Cave Road, No. 1-189
Austin, Texas 78746
(512) 410-1202 Telephone
(512) 410-1203 Facsimile

By: */s/   James H. Furman*
    James H. Furman
    Texas State Bar No. 07556600
    jfurman@furmanlawgroup.com

**ATTORNEYS FOR PLAINTIFFS**